Albert G. Lewis, LEW010
W. Eason Mitchell, MIT020
Justice D. Smyth, III, SMY004
**LEWIS & MITCHELL, LLC**
611 Helen Keller Boulevard
Tuscaloosa, Alabama 35404
**Attorneys for UNITED STATES OF AMERICA**
**and PATRICK BRUCE ATKINS, M.D., Plaintiffs**

FILED

03 JUN 25 PM 4:01

U.S. DISTRICT COURT
N.D. OF ALABAMA

## COMPLAINT FOR VIOLATIONS OF FALSE CLAIMS ACT
## FILED UNDER SEAL PURSUANT TO 31 U.S.C. SECTION 3730(b)(2)

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

UNITED STATES OF AMERICA, *ex rel.*
PATRICK BRUCE ATKINS, M.D. and
PATRICK BRUCE ATKINS, M.D.,  a
natural person,

      Plaintiffs,

vs.

CASE NO.. _____    CV-03-AR-1540-S

**DO NOT PLACE IN PRESS BOX**

**DO NOT ENTER ON PACER**

CHARLES M. McINTEER, M.D., a
natural person; MARILYN  ELIZABETH
LACHMAN,  M.D.,  a natural person; YHAP
PSYCHIATRIC SERVICES, INC., an Ala-
bama Corporation; NORTHPORT HEALTH
SERVICES, INC., an Alabama Corporation;
NORTHPORT HEALTH  AND REHAB-
ILITATION, L.L.C., an Alabama Limited
Liability Company;  BEVERLY HEALTH
AND REHABILITATION SERVICES, INC.,
 a foreign (California) Corporation; BEVERLY
ENTERPRISES-ALABAMA, INC., a foreign
(California) Corporation;  SUNBRIDGE
HEALTHCARE CORPORATION, a foreign
(New Mexico) Corporation; BEP SERVICES
(SOUTHERN) LLC, a foreign (Tennessee)
Corporation; MARINER HEALTH CENTRAL,



1

INC., a Foreign (Delaware) Corporation;
RAINTREE HEALTHCARE CORPORA-
TION, a foreign (Delaware) Corporation;
NATIONAL HEALTHCARE CORPORA-
TION, a foreign (Delaware) Corporation;
HALEYVILLE HEALTH CARE CENTER,
LLC, an Alabama Corporation; EASTERN
HEALTH SYSTEM, INC., an Alabama Corp-
oration, and CAPITOL HILL HEALTHCARE
CENTER, INC., an Alabama
Corporation,

        Defendants.

_____ /

## COMPLAINT FOR VIOLATIONS OF FALSE CLAIMS ACT
## (31 U.S.C. SECTION 3729, *et seq.*) AND DEMAND FOR JURY TRIAL

Plaintiffs, THE UNITED STATES OF AMERICA, *ex rel.* PATRICK BRUCE ATKINS, M.D., RELATOR ("UNITED STATES OF AMERICA" or "UNITED STATES") and PATRICK BRUCE ATKINS, M.D., a natural person ("RELATOR"), by and through their undersigned counsel of record, bring this action against the named defendants, respectfully showing and representing unto this United States District Court for the Northern District of Alabama as follows, *viz:*

### JURISDICTION AND VENUE

1.     This action is brought for the redress of grievances which are based upon and which arise out of violations of 31 U.S.C. Section 3729, *et seq.,* commonly referred to as the "False Claims Act" (the federal "False Claims Act" or "the Act" herein). The plaintiffs' complaint alleges that, under the auspices of the federally funded Medicare and Medicaid reimbursement programs, the named defendants presented or caused to be presented, to THE UNITED STATES OF AMERICA, false or fraudulent claims for reimbursement or

2

payment. Such claims were made by the defendants in connection with the ostensible provision of health care services to residents of skilled nursing facilities ("nursing homes") located within the State of Alabama. This action seeks an award of compensatory and treble damages; statutory civil penalties, costs of the action and statutory attorneys' fees. It is filed by *qui tam* RELATOR Patrick Bruce Atkins, M.D., who acts both for himself and on behalf of the government of THE UNITED STATES OF AMERICA under, *inter alia,* 31 U.S.C. Section 3730 (b).

2.      Jurisdiction for this action is based upon the relevant provisions of 31 U.S.C. Sections 3732 (a) and 3730 (b). This Court also has jurisdiction pursuant to 28 U.S.C. Sections 1331 and 1345, as The United States of America is a party hereto and the claims set forth herein are based upon laws of The United States of America.

3.      Venue is properly laid in the Northern District of Alabama, generally, pursuant to the provisions of 28 U.S.C. Section 1391 (b) as certain of the defendants conduct business or reside in this federal judicial district and one or more of the defendants make and/or have made, conspire to make and/or have conspired to make, false claims for payment from THE UNITED STATES OF AMERICA in this federal district and have, in fact, received payments of money from THE UNITED STATES OF AMERICA to which it, he, she or they were not entitled. Venue is further proper in this federal district pursuant to 31 U.S.C. Section 3732 (a) since the acts proscribed by 31 U.S.C. Sections 3729 *et seq.* and complained of herein took place in this federal district. Venue is laid in the Southern Division of the Northern District of Alabama, specifically, based on the fact that the wrongful conduct complained of herein has occurred, among other places, in Birmingham, Jefferson County, Alabama.

3

4.      As required by the False Claims Act, 31 U.S.C. Section 3730 (b)(2), RELATOR has provided to the Attorney General of the United States, Hon. John Ashcroft, and to the United States Attorney for the Northern District of Alabama, Hon. Alice H. Martin, a statement of all material evidence and information related to the complaint. Such disclosure statement is supported by material evidence known to RELATOR at his filing establishing the existence of the submission of false claims by the defendants, separately and severally. Because such statement includes attorney-client communication and work product of RELATOR'S counsel, and has been submitted to the Attorney General and to the United States Attorney in their capacities as potential co-counsel in the litigation, the RELATOR understands such disclosure to be confidential and has so indicated on the submission provided to prospective co-counsel.

5.      In conformity with the provisions of 31 U.S.C. Section 3730 (a) (2) and simultaneously with the *in camera* filing of this complaint, under seal, with the United States District Court for the Northern District of Alabama, RELATOR has caused a copy of this complaint to be delivered to the Attorney General of the United States, and to the United States Attorney for the Northern District of Alabama, by means of U.S. Certified Mail, return receipt requested.

## THE PARTIES

6.      The plaintiffs adopt and incorporate herein by reference, as fully and as completely as if set forth here in their entirety, the allegations set forth in paragraphs "1" through "5," inclusive, of this complaint.

7.      Plaintiff THE UNITED STATES OF AMERICA ("UNITED STATES OF AMERICA" or "UNITED STATES") prosecutes the claims of this action based upon, and following, the initial provision of facts supporting such claims by RELATOR.

RELATOR is the "original source" for such information as that term is more particularly defined under the relevant provisions of the federal False Claims Act.

8.    Plaintiff PATRICK BRUCE ATKINS, M.D. ("RELATOR") is, and at all times material hereto has been, a citizen of the State of Alabama, residing more particularly in Tuscaloosa, Tuscaloosa County, Alabama. He is a licensed medical doctor who is actively engaged in the practice of psychiatry within the State of Alabama. In conjunction with his private practice of medicine, RELATOR was engaged to provide medical services to certain skilled nursing facility ("SNF" or "nursing home") patients ("residents") who had previously been ostensibly evaluated and/or treated by defendants CHARLES M. McINTEER, M.D. ("McINTEER") and MARILYN ELIZABETH LACHMAN, M.D. ("LACHMAN"). Relator has standing herein, and he is authorized to prosecute this civil action, pursuant to 31 U.S.C. Section 3730 (b)(1).

9.    Defendant CHARLES M. McINTEER, M.D. ("McINTEER") is a natural person, over the age of nineteen (19) years, and is a resident citizen of the State of Alabama. Among other things, this defendant is engaged in the private practice of medicine and, in connection therewith, he provides health care services, for a profit, to persons who are residents of skilled nursing facilities (e.g., "nursing homes") situated within the State of Alabama. Service of process upon this defendant may be perfected by delivering a copy of the summons and complaint to him at 601 22nd Avenue South, Birmingham, Alabama 35205 or, failing effective service at that address, by making service at 400 East 10th Street, Anniston, Alabama 36207. This defendant is subject to this United States District Court's jurisdiction.

10.    Defendant MARILYN ELIZABETH LACHMAN, M.D. ("LACHMAN") is a natural person, over the age of nineteen (19) years, and a resident citizen of the State of

Alabama. Among other things, this defendant is engaged in the private practice of medicine and, in connection therewith, she provides health care services, for a profit, to persons who are residents of skilled nursing facilities (e.g., "nursing homes") situated within the State of Alabama. Service of process upon this defendant may be perfected by delivering a copy of the summons and complaint to her at 601 22nd Avenue South, Birmingham, Alabama 35205 or, failing effective service at that address, by making service at 400 East 10th Street, Anniston, Alabama 36207. This defendant is subject to this United States District Court's jurisdiction.

11.     Defendant YHAP PSYCHIATRIC SERVICES, INC. ("YHAP") is a proprietary, for-profit, corporation organized under, and existing subject to, the laws of the State of Alabama and the laws of the United States. Among other things, such corporation exists for the purpose of providing health care services, for a profit, to persons who are residents of skilled nursing facilities (e.g., "nursing homes") situated within the State of Alabama. This corporate defendant's principal office or place of business is located at 601 22nd Avenue South, Birmingham, Alabama 35205.  Service of process upon this defendant may be perfected by delivering a copy of the summons and complaint to Charles M. McInteer, M.D., 601 22nd Avenue South, Birmingham, Alabama 35205. This defendant is subject to this United States District Court's jurisdiction.

12.     Defendant NORTHPORT HEALTH SERVICES, INC. ("NORTHPORT HEALTH") is a proprietary, for-profit, corporation organized under, and existing subject to, the laws of the State of Alabama and the laws of the United States. Among other things, such corporation exists for the purpose of providing health care services, for a profit, to persons who are residents of skilled nursing facilities (e.g., "nursing homes") situated within the State of Alabama. This corporate defendant's principal office or place

6

of business is located at 931 Fairfax Park, Tuscaloosa, Alabama 35406-2805. Service of process upon this defendant may be perfected by delivering a copy of the summons and complaint to The Corporation Company, 2000 Interstate Park Drive, Suite 204, Montgomery, Alabama 36109. This defendant is subject to the District Court's jurisdiction.

13.     Defendant NORTHPORT HEALTH AND REHABILITATION, L.L.C. ("NORTHPORT L.L.C.") is a proprietary, for-profit, limited liability company organized under, and existing subject to, the laws of the State of Alabama and the laws of the United States. Among other things, such entity exists for the purpose of providing health care services, for a profit, to persons who are residents of skilled nursing facilities (e.g., "nursing homes") situated within the State of Alabama. This corporate defendant's principal office or place of business is located in Birmingham, Alabama and service of process upon this defendant may be perfected by delivering a copy of the summons and complaint to Edward R. Christian, 420 North 20th Street, Suite 3100, Birmingham, Alabama 35203. This defendant is subject to the District Court's jurisdiction.

14.     Defendant BEVERLY HEALTH AND REHABILITATION SERVICES, INC. ("BEVERLY HEALTH") is a proprietary, for-profit, foreign (California) corporation which does business in this jurisdiction subject to the laws of the State of Alabama and the laws of the United States. Among other things, such corporation exists for the purpose of providing health care services, for a profit, to persons who are residents of skilled nursing facilities (e.g., "nursing homes") situated within the State of Alabama. This corporate defendant's principal office or place of business is located at 1000 Beverly Way, Fort Smith, Arkansas 72919-9008. Service of process upon this defendant may be perfected by delivering a copy of the summons and complaint to Corporation Service

7

Company, Inc., 57 Adams Avenue, Montgomery, Alabama 36104-4045. This defendant is subject to the District Court's jurisdiction.

15.     Defendant BEVERLY ENTERPRISES-ALABAMA, INC. ("BEVERLY ENTERPRISES") is a proprietary, for-profit, foreign (California) corporation which does business in this jurisdiction subject to the laws of the State of Alabama and the laws of the United States. Among other things, such corporation exists for the purpose of providing health care services, for a profit, to persons who are residents of skilled nursing facilities (e.g., "nursing homes") situated within the State of Alabama. This corporate defendant's principal office or place of business is located at 1000 Beverly Way, Fort Smith, Arkansas 72919-9008. Service of process upon this defendant may be perfected by delivering a copy of the summons and complaint to Corporation Service Company, Inc., 57 Adams Avenue, Montgomery, Alabama 36104-4045. This defendant is subject to the District Court's jurisdiction.

16.     Defendant SUNBRIDGE HEALTHCARE CORPORATION ("SUNBRIDGE") is a proprietary, for-profit, foreign (New Mexico) corporation which does business in this jurisdiction subject to the laws of the State of Alabama and the laws of the United States. Among other things, such corporation exists for the purpose of providing health care services, for a profit, to persons who are residents of skilled nursing facilities (e.g., "nursing homes") situated within the State of Alabama. This corporate defendant's principal office or place of business is located at 101 Sun Lane, Northeast, Albuquerque, New Mexico 87109. Service of process upon this defendant may be perfected by delivering a copy of the summons and complaint to The Corporation Company, 2000 Interstate Park Drive, Suite 204, Montgomery, Alabama 36109. This defendant is subject to the District Court's jurisdiction.

8

17.     Defendant BEP SERVICES (SOUTHERN) LLC ("BEP SERVICES") is a proprietary, for-profit, foreign (Tennessee) corporation which does business in this jurisdiction subject to the laws of the State of Alabama and the laws of the United States. Among other things, such corporation exists for the purpose of providing health care services, for a profit, to persons who are residents of skilled nursing facilities (e.g., "nursing homes") situated within the State of Alabama. This corporate defendant's principal office or place of business is located at 3839 Forest Hill – Irene Road, Memphis, Tennessee 38125. Service of process upon this defendant may be perfected by delivering a copy of the summons and complaint to The Corporation Company, 2000 Interstate Park Drive, Suite 204, Montgomery, Alabama 36109. This defendant is subject to the District Court's jurisdiction.

18.     Defendant MARINER HEALTH CENTRAL, INC. ("MARINER") is a proprietary, for-profit, foreign (Delaware) corporation which does business in this jurisdiction subject to the laws of the State of Alabama and the laws of the United States. Among other things, such corporation exists for the purpose of providing health care services, for a profit, to persons who are residents of skilled nursing facilities (e.g., "nursing homes") situated within the State of Alabama. This corporate defendant's principal office or place of business is located at One Ravinia Drive, Suite 1500, Atlanta, Georgia 30346. Service of process upon this defendant may be perfected by delivering a copy of the summons and complaint to The Corporation Company, 2000 Interstate Park Drive, Suite 204, Montgomery, Alabama 36109. This defendant is subject to the District Court's jurisdiction.

19.     Defendant RAINTREE HEALTHCARE CORPORATION ("RAINTREE") is a proprietary, for-profit, foreign (Delaware) corporation which does business in this

jurisdiction subject to the laws of the State of Alabama and the laws of the United States. Among other things, such corporation exists for the purpose of providing health care services, for a profit, to persons who are residents of skilled nursing facilities (e.g., "nursing homes") situated within the State of Alabama. This corporate defendant's principal office or place of business is located at 15300 North 90th Street, Suite 100, Scottsdale, Arizona 85260-2771. Service of process upon this defendant may be perfected by delivering a copy of the summons and complaint to Corporation Service Company, Inc., 57 Adams Avenue, Montgomery, Alabama 36104-4045. This defendant is subject to the District Court's jurisdiction.

20.     Defendant NATIONAL HEALTHCARE CORPORATION ("NATIONAL HEALTHCARE") is a proprietary, for-profit, foreign (Delaware) corporation which does business in this jurisdiction subject to the laws of the State of Alabama and the laws of the United States. Among other things, such corporation exists for the purpose of providing health care services, for a profit, to persons who are residents of skilled nursing facilities (e.g., "nursing homes") situated within the State of Alabama. This corporate defendant's principal office or place of business is located at 100 Vine Street, Suite 1400, Murfreesboro, Tennessee 37130. Service of process upon this defendant may be perfected by delivering a copy of the summons and complaint to National Registered Agents, Inc., 150 South Perry Street, Montgomery, Alabama 36104. This defendant is subject to the District Court's jurisdiction.

21.     Defendant   HALEYVILLE   HEALTH   CARE   CENTER,   LLC ("HALEYVILLE HEALTH CARE") is a proprietary, for-profit, corporation organized under, and existing subject to, the laws of the State of Alabama and the laws of the United States. Among other things, such corporation exists for the purpose of providing

health care services, for a profit, to persons who are residents of skilled nursing facilities (e.g., "nursing homes") situated within the State of Alabama. This corporate defendant's principal office or place of business is located at 1901 Sixth Avenue North, 2900 AmSouth Harbert Plaza, Birmingham, Alabama 35203-2618. Service of process upon this defendant may be perfected by delivering a copy of the summons and complaint to R. Frank Brown, Jr., 401 Arnold Street, Cullman, Alabama 35565. This defendant is subject to the District Court's jurisdiction.

22.    Defendant EASTERN HEALTH SYSTEM, INC. ("EASTERN HEALTH") is a proprietary, for-profit, corporation organized under, and existing subject to, the laws of the State of Alabama and the laws of the United States. Among other things, such corporation exists for the purpose of providing health care services, for a profit, to persons who are residents of skilled nursing facilities (e.g., "nursing homes") situated within the State of Alabama. This corporate defendant's principal office or place of business is located at 48 Medical Park Drive East, Suite 450, Birmingham, Alabama 35235. Service of process upon this defendant may be perfected by delivering a copy of the summons and complaint to Robert C. Chapman, 48 Medical Center Park Drive East, Suite 450, Birmingham, Alabama 35235. This defendant is subject to the District Court's jurisdiction.

23.    Defendant CAPITOL HILL HEALTHCARE CENTER, INC. ("CAPITOL HILL") is a proprietary, for-profit, corporation organized under, and existing subject to, the laws of the State of Alabama and the laws of the United States. Among other things, such corporation exists for the purpose of providing health care services, for a profit, to persons who are residents of skilled nursing facilities (e.g., "nursing homes") situated within the State of Alabama. This corporate defendant's principal office or place of

business is located at 520 South Hull Street, Montgomery, Alabama 36104-4610. Service of process upon this defendant may be perfected by delivering a copy of the summons and complaint to Roger Turenne, Turenne & Associates, LLC, 7 Clayton Street, Suite 1200, Montgomery, Alabama 36104. This defendant is subject to the District Court's jurisdiction.

## GENERAL ALLEGATIONS

24.     The plaintiffs adopt and incorporate herein by reference, as fully and as completely as if set forth here in their entirety, the allegations set forth in paragraphs "1" through "23," inclusive, of this complaint.

25.     There are approximately seventeen thousand (17,000) skilled nursing facilities (e.g., "nursing homes") presently operating in the United States with a total bed capacity of some 1.8 million.[1]  Proprietary ownership accounts for some two-thirds of all facilities (with the balance being governmental or non-profits) and more than half of American nursing homes are part of chains or "multifacility" organizations. [2] The industry is highly fragmented, with no dominant providers. The largest provider, Beverly Enterprises, operates fewer than forty (40%) percent of the total SNF beds in the United States at the present time.[3]

26.     Almost all nursing homes, including those which are named as defendants in this action, are certified to participate in either (or both) the Medicare and/or

---

[1] The National Center for Health Statistics defines "nursing homes" as facilities with three or more beds which routinely provide nursing care services. WUNDERLICH & KOHLER, IMPROVING THE QUALITY OF LONG-TERM CARE 42 (2001). See also: David A. Bohm, "Striving for Quality Care in America's Nursing Homes: Tracing the History of Nursing Homes and Noting the Effect of Recent Federal Government Initiatives to Ensure Quality Care in the Nursing Home Setting. 4 DEPAUL J. HEALTH CARE L. 317, 324031 (2001).
[2] WUNDERLICH & KOHLER, *supra* Note 1, at 43.
[3] CENTERS FOR MEDICARE AND MEDICAID SERVICES, U.S. Department of Health and Human Services, "CMS Health Care Industry Market Update – Nursing Facilities" (Feb. 6, 2002), available at http://www.cms.hhs.gov/reports/hcimu/hcimu_02062002.pdf.

Medicaid systems of health care reimbursement. More than seventy-five (75%) percent of facilities are certified to participate in both programs. Nursing home facilities may be freestanding or they may be operated as a separate "SNF unit" of a larger institution (i.e., as part of an acute care hospital or a "continuing care retirement community"). Some two thousand five hundred (2,500) nursing homes are "hospital based" facilities.[4]

27.     Over ninety (90%) percent of nursing home residents are over age 65; almost half are over age 85 and *the average age is over 80*.[5] On average, nursing home residents have been found to be older and more disabled than persons using home and community-based long term care services, and this fact is borne out in the high proportion of nursing home residents who need assistance with three or more activities of daily living.[6] Over the past ten years, United States nursing homes have experienced a substantial rise in the illness, disability and complexity levels of admittees, reflecting the fact that institutional placement is reserved today for those individuals who eventually have no viable long-term care choice other than a nursing home. Notably, dementia is the most common health condition among American nursing home residents today.[7]

28.     As a result of the increased illness, disability and complexity levels of persons admitted to SNF facilities in the United States, together with increasing levels of severe cognitive and/or emotional impairment in a large percentage of the nursing home resident populations, there are obvious constraints upon the ability of many residents to

---

[4] *Id.*, Note 3, *supra.*

[5] *Id.*, Note 3, *supra.*

[6] WILLIAM D. SPECTOR, *et al.*, "The Characteristics of Long-Term Care Users," AHRQ Pub. No. 00-0049, at 9 (September, 2000).

[7] Marshall B. Kapp, "The 'Voluntary' Status of Nursing Facility Admissions: Legal, Practical and Public Policy Implications," 24 NEW ENG. J. CRIM. & CIVIL CONFINEMENT 1 (1998); Nancy A. Krauss and Barbara M. Altman, CHARACTERISTICS OF NURSING HOME RESIDENTS, MEPS RESEARCH FINDINGS NO. 5, AHCPR PUB. NO. 99-0006 (Rockville, MD, Agency for Health Care Policy and Research 1998).

play any meaningful role in the design and monitoring of their own care. [8] Because of the mental, physical and emotional limitations of these very aged, and often quite frail, nursing home residents, they have little or no voice in the control and prevention of patient maltreatment and even less ability to combat Medicare and Medicaid fraud and abuse when it occurs within the facilities they recognize as their "homes."

29.     During calendar year 2000, total spending on nursing home care amounted to over Ninety Two Billion ($92,000,000,000.00) Dollars. [9] Presently, approximately two-thirds of all nursing home residents rely on government assistance to pay for their care, either from the initial date of their admission or from the date upon which they exhaust their own resources, enabling them to qualify for Medicaid coverage. Medicaid now pays for over half of all nursing home care rendered in the United States,[10] which amounted to some $39.6 billion in fiscal year 2000.[11]

30.     The vast majority of direct resident care in United States nursing homes is provided by nurses and certified nurse assistants ("CNA's"), many of the latter of whom are being paid at or near minimum wage. [12] Inadequate staffing levels, together with extensive staff turnover at all levels, continue to be recognized as serious, ongoing and

---

[8] Simmons & Schnelle, "The Identification of Residents Capable of Accurately Describing Daily Care: Implications for Evaluating Nursing Home Quality," 41 GERONTOLOGIST 605 (2001)
[9] CENTERS FOR MEDICARE AND MEDICAID SERVICES, U.S. Department of Health and Human Services, CMS HEALTH CARE INDUSTRY MARKET UPDATE – NURSING FACILITIES (Feb. 6, 2002) at 6, available at http://www.cms.hhs.gov/reports/hcimu/hcimu_02062002.pdf
[10] Sara Rosenbaum, Medicaid, 346 NEW ENG. J. MED. 635 (2002); Diane Rowland, Medicaid at 30, "New Challenges for the Nation's Health Safety Net," 274 JAMA 271 (1995)
[11] Brian Burwell, "Medicaid Long-Term Care Expenditures in Fiscal Year 2000," 20 HEALTH CARE FIN. REV. 83, 106 (Fall, 1998)
[12] 42 C.F.R. Secs. 483.75 (e) & (f); AARP PUBLIC POLICY INSITUTE FACT SHEET 86, "The Nursing Home Work Force: Certified Nurse Assistants" (July, 2001), available at http://research.aarp.org/health/fs86_cna.html.

largely intractable management issues for U.S. nursing home owners, with an often negative impact on the quality of resident care.[13]

31.     Physician presence in most nursing homes is quite minimal when compared with the customary staffing patterns found in acute care hospitals.[14] Indeed, the American Geriatrics Society has stated: "[P]hysicians still do not spend significant amounts of time caring for nursing home residents." [15] Even though it is mandatory that nursing homes participating in Medicare and Medicaid contract in writing with a licensed physician to serve as the facility medical director,[16] who is assigned the administrative responsibility of overseeing the overall quality of medical care which is provided to the residents of his or her facility, the medical director is allowed to (and in all but the largest facilities, does) fulfill this role on a part-time basis. This is true of the majority of the SNF facilities which are named as defendants in this action.

32.     Federal law mandates: "A physician must personally approve in writing a recommendation that an individual be admitted to a facility. Each resident must remain under the care of a physician."[17] Each resident must be examined by a physician at least once every thirty (30) days for the first ninety (90) days after admission, and at least once

---

[13] Nicholas G. Castle, "Administrator Turnover and Quality of Care in Nursing Homes," 41 GERONTOLOGIST 757 (2001); Karl Pillemer, "Solving the Frontline Crisis in Long-Term Care: A Practical Guide to Finding and Keeping Quality Nursing Assistants" (1996); Linda S. Noelker, "The Backbone of the Long-Term Care Workforce," 25 GENERATIONS 85 (Spring, 2001); Cf., Jack Needleman, et al., "Nurse-Staffing Levels and the Quality of Care in Hospitals," 346 NEW ENG. J. MED. 1715 (2002) (finding similar association between level of nurse staffing and "better quality of care" for hospitalized patients).
[14] Paul R. Katz, et al., "Medical Practice with Nursing Home Residents: Results from the National Physician Professional Activities Census," 45 J. AM. GERIATRICS SOC'Y 911 (1997); Fortinsky & Raff, "The Changing Role of Physicians in Nursing Homes," 19 GENERATIONS 30 (Winter 1995-1996).
[15] American Geriatrics Society Clinical Practice Committee, Regulation and Quality of Care Standards in Nursing Facilities, 48 J. AM. GERIATRICS SOC'Y 1519 (2000), available at www.americangeriatrics.org/products/positionpapers/regulnl.shtml.
[16] 42 C.F.R. Sec. 483.75 (i).
[17] 42 C.F.R. Sec. 483.40(a).

every sixty (60) days thereafter.[18] Beyond these requirements, physician contact with nursing home residents often comes in the form of giving telephone orders, sending residents to the hospital in response to calls from the nursing staff to report problems, or treatment of residents who are first transported to private physician offices. The question of whether skilled nursing facilities are rendering appropriate levels of medical care and treatment, including indicated mental health (e.g., psychiatric) services, to Medicare- and Medicaid-eligible residents has become an increasingly significant issue in the nursing home industry as it exists today.

33.     In order to address growing concerns surrounding the neglect and abuse of elderly and infirm nursing home residents, and as part of a concerted effort to combat substandard medical care in the nation's nursing home facilities, Congress enacted, as part of the Omnibus Budget Reconciliation Act of 1987,[19] the so-called "Nursing Home Reform Act."[20] The Act requires nursing home facilities to comply with federal requirements when providing health care services to patients. It specifically requires that "[a] nursing facility must care for its residents in such a manner and in such an environment as will promote maintenance or enhancement of the quality of life of each resident."[21] Facilities must also provide "services and activities to attain or maintain the highest practicable physical, mental, and psychological well-being of each resident," which is to be done in accordance with "individualized written care plans."[22]

34.     The Nursing Home Reform Act specifies the limited conditions under which restraints may be used on nursing home residents and establishes qualitative

---

[18] *Id.*, Note 17, Sec. 483.40(c).
[19] 42 U.S.C. Sec. 1359i-3 (1994).
[20] 42 U.S.C. Sec. 1396r (1994).
[21] 42 U.S.C. Secs. 1396r (b)(1)(a), 1395i-3 (b)(1)(a) (1994).
[22] *Id.*, at Secs. 1396r (b)(2)(a), 1395i-3 (b)(2)(a) (1994).

nutritional standards.[23] The Act prohibits discrimination against Medicaid beneficiaries, providing that "a nursing facility must establish and maintain identical policies and practices regarding transfer, discharge and covered services under [Medicare and/or Medicaid] for all individuals, regardless of source of payment."[24] Additionally, Medicaid-eligible residents are to be provided with the "necessary therapy" regardless of whether the State Medicaid program provides extra reimbursement for such services. The law provides that a person deciding "whether" to provide therapy in a nursing home cannot consider the source of reimbursement in making the determination to provide, or not provide, the health care services which are required by the condition of the resident.[25]

35.  The Nursing Home Reform Act expanded requirements which nursing homes must meet for Medicare certification. The Act focuses on each resident's highest potential for physical, mental and psychosocial well-being with reasonable accommodation for individual needs. The Act mandates that all nursing facility residents must be screened and regularly evaluated to determine whether they have a mental illness or mental retardation; whether they need active treatment and what kind of physician-supervised individual treatment plan is necessary under the circumstances. The Act requires that residents appropriately placed in nursing facilities receive a full range of services to address their psychosocial needs and behavioral problems.

36.  Medicare certified SNF facilities are required to "conduct standardized, reproducible assessments of each resident's functional capacity..." within fourteen (14) days of admission, if the patient's condition changes, and at least every twelve (12) months to determine appropriate services. This assessment used the Resident

---

[23] Id., at Secs. 1396r (c)(1)A)(ii), 1396r (b)(4)(A)(iv) (1994).

[24] 42 U.S.C. Secs. 1395i-3 (c)(4), 1396r (c)(4), 1396r (c)(4)(a) (1994); 42 C.F.R. Sec. 483.12 (c)(1) (1994).

[25] 42 C.F.R. Sec. 483.45 (a)(1)(2) (1998), 42 U.S.C. Secs. 1395i-3 (c)(4), 1396r (c)(4)(a) (1994) [equal access provision]; 42 C.F.R. Sec. 483.12 (c) (1) (1998).

Assessment Instrument ("RAI") which is a multidimensional, clinically focused evaluation tool. It provides a basis for initially identifying problems and is to be used in developing the resident's continuing plan of care. The RAI has two parts: the Minimum Data Set ("MDS") which is the basis of the resident assessment process and the Resident Assessment Protocols ("RAPS") which identify the residents' unique problems.  This information is required to be used by an interdisciplinary team and the resident in developing the resident's individualized, comprehensive, care plan. Seven of the eighteen (18) RAP's specifically address mental health problems commonly found in nursing facilities such as: delirium; cognitive loss/dementia; psychosocial well-being; sad and anxious moods; behavioral problems; psychotropic drug use and the use of physical restraints.

37.    The Nursing Home Reform Act also mandated the development of regulations constraining the use of psychotropic drugs. The Centers for Medicare & Medicaid Services of the U. S. Department of Health and Human Services  ("CMS") regulations provide that residents must be free from unnecessary drugs, not be given antipsychotic drugs except to treat a specific conditions and be given gradual does reductions.

38.    As with all "Part B" Medicare health services, covered mental health services must be "reasonable and necessary for the diagnosis or treatment of an illness or injury or to improve the functioning of a malformed body member." Payment is prohibited for medical services that are for prevention, palliation, research or experimentation. While psychotropic drugs may be prescribed only by a physician, behavioral and psychotherapeutic approaches may be carried out by a psychiatrist, a clinical psychologist and/or a clinical social worker. While clinical psychologists'

18

services are covered the same as services by a physician, they may only provide those services they are legally authorized to perform in their state. Additionally, independent clinical social workers may not bill Medicare "Part B" for services furnished to an inpatient of a skilled nursing facility that the facility is required to provide as a Medicare "condition of participation."

39.     While the majority of nursing homes are no doubt operated honestly and efficiently, with positive results inuring to the benefit of the residents, there unfortunately appear to be increasing numbers of nursing homes (operated both independently and as "profit centers" within national nursing home facility "chains") which are being operated in direct violation of the regulatory provisions of the Nursing Home Reform Act and other statutory mandates. These facilities have civil liability for such violations under, among other statues, the federal False Claims Act, as set out more fully herein. This liability is based upon a certification signed by the nursing home's administrator which states the facility has complied with all governmental regulations associated with the operation of the facility, including the Nursing Home Reform Act.

40.     Each time an Alabama Medicare-certified skilled nursing facility submits its certification of compliance to the Centers for Medicare and Medicaid Services or "CMS" (formerly known as the "Health Care Finance Administration" or "HCFA"), the facility represents that it has complied with all relevant requirements of the Nursing Home Reform Act. If, however, the facility is actually failing to meet the requirements of the Act, each and every claim made for the cost of substandard care is a "false claim" within the meaning of the federal False Claims Act ("FCA"). Substandard care can form the basis for an FCA claim. Indeed, the United States has previously alleged that a psychiatric hospital violated the False Claims Act by filing claims for reimbursement

while "knowingly failing to provide the government-insured patients with a reasonably safe environment." *Aranda v. Community Psychiatric Centers, Inc.*, 945 F.Supp. 1485, 1487 (W.D. Okla. 1996). In *Aranda*, liability was imposed based on the defendant's failure to meet professionally recognized standards in health care as required by 42 C.F.R. Sec. 455.2, a regulation promulgated pursuant to 42 U.S.C. Secs. 1902 (a)(4), 1903 (i)(2) and 1909 of the Social Security Act. The regulation prohibits fraud in the Medicaid program.

41.     A series of four FCA cases based on claims that nursing homes provided inadequate care were brought and settled by the Assistant United States Attorney for the Eastern District of Pennsylvania. Allegations included failure to provide adequate nursing care; inadequate or improper resident monitoring and deficient staffing. [26] As in *Aranda*, the claims of the UNITED STATES OF AMERICA were based upon the nursing homes' certification that the provision of services or items for which payment had been claimed comported with all federal and state laws and regulations. [27] The four Pennsylvania actions resulted in monetary settlements as well as consent decrees requiring the nursing homes to prospectively comply with the provisions of the Nursing Home Reform Act.

42.     Other False Claims Act cases involving allegations of inadequate or improper nursing home care have been filed around the nation. In late 1998, the United States Department of Justice announced it had intervened and simultaneously settled a *qui tam* suit alleging that a Maryland nursing home falsely certified compliance with

---

[26] *United States v. GMS Management-Tucker, Inc.*, No. 96-1271 (E.D. Pa. filed Feb. 21, 1996), reported at FALSE CLAIMS ACT & QUI TAM Q. REV., July, 1996, at 31; *United States v. Chester Care Ctr.*, No. 98-CV-139 (E.D. Pa. filed Jan. 13, 1998), reported at 7 Health L. Rep. (BNA) 162 (Jan. 29, 1998); *United States v. Philadelphia*, No. 98-4253 (E.D. Pa.), reported at 7 Health L. Rep. (BNA) 1494 (Sept. 24, 1998); *United States v. Integrated Health Servs. at Penn, Inc.* (E.D. Pa., settled before filing), reported at 8 Health L. Rep. (BNA) 857 (May 27, 1999).
[27] See: David R. Hoffman, "The Federal False Claims Act as a Remedy to Poor Care," FALSE CLAIMS ACT & QUI TAM Q. REV., July 1996, at 31.

federal laws requiring homes to meet certain standards of care to participate in State and federally funded health care programs.[28] The U. S. Department of Health and Human Services, acting through HCFA, closed down the facility and moved residents to other area nursing homes.[29]

43.    In May of 1999, the U. S. Department of Justice announced the settlement with Georgia-based Kansas Health Care Investors and Maryland-based Rehab Works, Inc., to resolve the allegations that the defendants falsely certified compliance with federal regulations regarding nursing home standards of care in order to receive Medicare reimbursement. The homes were alleged to have provided inadequate nutrition and unsanitary living conditions to residents and billed Medicare for physical, occupational and speech pathology therapy services which were not medically necessary.[30]

44.    In addition to the litigation of civil claims, federal prosecutors have worked in collaboration with the United States Department of Health and Human Services' Office of Inspector General ("OIG")[31] in securing criminal indictments against nursing homes based on the contention that a nursing home which bills the Medicare or Medicaid programs for payments when the care provided was substandard has attempted to defraud the government and, hence, has violated the federal False Claims

---

[28] *United States v. Greenbelt Nursing & Rehabilitation* (D. Md. Filed Sept. 14, 1998), reported at FALSE CLAIMS ACT & QUI TAM Q. REV., Oct. 1998, at 39.

[29] HCFA, going further, ultimately barred the facility from any further participation in the Medicare program because of continuing concerns regarding quality of care. The U. S. District Court found the Agency had the authority to close the nursing home even though the home had signed a consent agreement with the Department of Justice providing that it "would comply" with all governmental regulations, including the Nursing Home Reform Act.

[30] No. 96-1427-WEB (D. Kan. filed Nov. 26, 1996), reported at FALSE CLAIMS ACT & QUI TAM Q. REV., July 1999, at 34.

[31] The DHHS Office of Inspector General has issued "Compliance Program Guidance for Nursing Facilities" that speaks directly to the requirements which are associated with quality of care. 65 Fed. Reg. 14289, 14293-94 (March 16, 2000).

Act.[32] The submission of fraudulent claims through the mail or electronic transfers allows the government to additionally invoke the mail and wire fraud acts (18 U.S.C. Secs. 1341 & 1343) which are considered "predicate offenses" under the Racketeer Influenced and Corrupt Organizations Act ("RICO"). In addition to criminal penalties, nursing homes may be exposed to remedies for violations of the federal False Claims Act which include fines of between Five Thousand ($5,000.00) Dollars and Ten Thousand ($10,000.00) Dollars *per false claim submitted*, plus treble damages.[33]

45.     The U. S. Department of Health and Human Services' Office of Inspector General ("OIG") has devoted significant amounts of time and attention under its so-called "Operation Restore Trust" initiative. This program was established for the purpose of assessing the quality of care being provided to residents of skilled nursing facilities across the nation. "Quality of care" studies have included evaluations of the role of the nursing home medical director; family experience with nursing home care; quality assurance committees in nursing homes; nurse aide training and survey and certification consistency and reliability. [34] In addition, increasing numbers of claims are being filed against medical practitioners who knowingly present "upcoded" claims for Medicare reimbursement[35] or claims for health care services which have, in fact, not actually been

---

[32] 18 U.S.C. Sec. 287. See: Bohm, *supra* Note 1, at 338-54; John R. Munich & Elizabeth W. Lane, "When Neglect Becomes Fraud: Quality of Care and False Claims, 43 ST. LOUIS U.L.J. 27, 35 (1999); Angela S. Quin, "Imposing Federal Criminal Liability on Nursing Homes: A Way of Deterring Inadequate Health Care and Improving the Quality of Care Delivered?", 43 ST. LOUIS U.L.J. 653, 668 (1999); David R. Hoffman, "The Role of the Federal Government in Ensuring Quality of Care in Long-Term Care Facilities," 6 ANNALS HEALTH L. 147 (1997).

[33] 31 U.S.C. Secs. 3729-3732.

[34] Janet Rehnquist, DHHS Inspector General, Fiscal Year 2003 Budget Request, Testimony before the Subcommittee on Labor-HHS-Education, Committee on Appropriations, U.S. House of Representatives (Mar. 5, 2002), at 4.

[35] "Upcoding" refers to the (unlawful) physician practice of providing a Medicare insured resident with a non-reimbursable health care service, followed by the physician's submission of a claim for reimbursement of a Medicare-covered service by the government. "Upcoding" can also refer to the (unlawful) physician

provided. <u>It is unlawful for nursing homes and/or physicians to bill Medicare or Medicaid for services which are not rendered or for services which are not provided as claimed, or to bill for services which are not medically necessary.</u>[36]

46.      Medicare certified skilled nursing facilities, and physicians who provide (or claim to provide) health care services to residents of such facilities, are liable in damages under the Federal False Claims Act when they seek reimbursement for such services with actual knowledge (or by acting with deliberate indifference to the truth or falsity of the information submitted, or by acting in reckless disregard of the information submitted) that the services for which reimbursement is sought were not, in fact, provided; that the services for which reimbursement is sought were not reasonably or medically necessary or appropriate or that the services for which reimbursement is sought do not meet the standards required under the Medicare and Medicaid programs as prerequisites to payment.[37]

## FACTUAL ALLEGATIONS

47.      The plaintiffs adopt and incorporate herein by reference, as fully and as completely as if set forth here in their entirety, the allegations set forth in paragraphs "1" through "46," inclusive, of this complaint.

48.      Plaintiffs THE UNITED STATES OF AMERICA, *ex rel.* Patrick Bruce Atkins, M.D., ("UNITED STATES") and PATRICK BRUCE ATKINS, M.D., acting

---

practice of submitting a claim for reimbursement for the provision of a health care service which has a higher rate of payment than the health care service which the physician has actually provided.
[36] Moreover, the Social Security Act imposes civil monetary penalties against any person who knowingly presents, or causes to be presented, to an officer, employee or agent of the United States, or of any department or agency thereof, or any State agency . . . a claim . . . that the Secretary determines . . . is for a medical or other item or service that the person knows or should know will result in a greater payment to the person than the code the person knows or should know is applicable to the item or service actually provided. 18 U.S.C. Sec. 287.
[37] See, e.g., *United States vs. NHC Healthcare Corp.*, 115 F.Supp.2d 1149 (W.D. Missouri, 2000).

individually ("RELATOR") bring this action (among other things) for the recovery of money fraudulently obtained from or through, or which was mistakenly paid by or under, the Medicare (Title XVIII of the Social Security Act) and Medicaid (Title XIX of the Social Security Act) reimbursement programs which are administered by the U.S. Department of Health and Human Services' Centers for Medicare and Medicaid Services ("CMS," formerly known as the "Health Care Financing Administration"). Such payments were obtained, and paid, for and in connection with the submission of false or fraudulent claims for the provision of health care services to residents of skilled nursing facilities ("SNF residents") located within the State of Alabama. Such health care services were said to, but they did not, comport with Medicare and Medicaid standards authorizing reimbursement for same.

49.     Defendant CHARLES M. McINTEER, M.D. ("McINTEER") is a medical doctor, specializing in the practice of psychiatry, who graduated from the Autonomous University of Guadalajara in Guadalajara, Jalisco, Mexico in 1988. He is currently authorized to practice medicine in the State of Alabama, under License Number 00022296 issued by the Alabama Board of Medical Examiners on or about October 28, 1998. A substantial part of this defendant's active medical practice is, and at all times material hereto has been, devoted to the provision of medical (psychiatric) services to patients residing in skilled nursing facilities located within the state of Alabama.

50.     RELATOR is informed and believes, and on that basis avers, that defendant McINTEER is, and at all times material hereto has been, designated by CMS as a qualified provider of health care (i.e., psychiatric) services and that he is, therefore, eligible for reimbursement for the provision of such services under the Medicare and Medicaid programs. He further avers that this defendant is a party to one or more

Medicare Provider Agreements and, pursuant thereto and as an authorized Medicare provider of health care services to SNF residents, such defendant has agreed to observe, satisfy and comply with all federal laws, regulations, rules and instructions pertaining to the administration of the Medicare program in conjunction with SNF's including, but not limited to, those which are set out in the Code of Federal Regulations ("CFR") and other laws and regulations arising out of or pertaining thereto.

51.     RELATOR is informed and believes, and on that basis avers, that defendant McINTEER is, and at all times material hereto has been, designated as a qualified provider of health care (i.e., psychiatric) services under various Alabama Medicaid Agency ("Medicaid") programs which arise out of Title XIX of the Social Security Act. While Medicaid programs are administered by the various state governments, THE UNITED STATES OF AMERICA pays for a majority of all Medicaid costs. RELATOR is further informed and believes, and on that basis avers, that defendant McINTEER is a party to one or more Alabama Medicaid Agency Provider Agreement(s) and that such defendant has agreed to observe, satisfy and comply with all federal and state laws, regulations, rules and instructions pertaining to the administration of the Alabama Medicaid Program including, but not limited to, those which are set out in the Code of Federal Regulations ("CFR") and other laws and regulations arising out of our pertaining thereto.

52.     Defendant MARILYN ELIZABETH LACHMAN ("LACHMAN") is a medical doctor, specializing in the practice of psychiatry, who graduated from the Autonomous University of Guadalajara in Guadalajara, Jalisco, Mexico in 1988. She is currently authorized to practice medicine in the State of Alabama, under License Number 00021572 issued by the Alabama Board of Medical Examiners on or about

March 4, 1998. A substantial part of this defendant's active medical practice is, and at all times material hereto has been, devoted to the provision of medical (psychiatric) services to patients residing in skilled nursing facilities located within the state of Alabama.

53.     RELATOR is informed and believes, and on that basis avers, that defendant LACHMAN is, and at all times material hereto has been, designated by CMS as a qualified provider of health care (i.e., psychiatric) services and that she is, therefore, eligible for reimbursement for the provision of such services under the Medicare and Medicaid programs. He further avers that this defendant is a party to one or more Medicare Provider Agreements and, pursuant thereto and as an authorized Medicare provider of health care services to SNF residents, such defendant has agreed to observe, satisfy and comply with all federal laws, regulations, rules and instructions pertaining to the administration of the Medicare program in conjunction with SNF's including, but not limited to, those which are set out in the Code of Federal Regulations ("CFR") and other laws and regulations arising out of or pertaining thereto.

54.     RELATOR is informed and believes, and on that basis avers, that defendant LACHMAN is, and at all times material hereto has been, designated as a qualified provider of health care (i.e., psychiatric) services under various Alabama Medicaid Agency ("Medicaid") programs which arise out of Title XIX of the Social Security Act. While Medicaid programs are administered by the various state governments, THE UNITED STATES OF AMERICA pays for a majority of all Medicaid costs. RELATOR is further informed and believes, and on that basis avers, that defendant LACHMAN is a party to one or more Alabama Medicaid Agency Provider Agreement(s) and that such defendant has agreed to observe, satisfy and comply with all federal and state laws, regulations, rules and instructions pertaining to the administration of the

Alabama Medicaid Program including, but not limited to, those which are set out in the Code of Federal Regulations ("CFR") and other laws and regulations arising out of our pertaining thereto.

55.    Defendant YHAP PSYCHIATRIC SERVICES, INC. ("YHAP") is a proprietary, for-profit, corporation organized under, and doing business pursuant to, the laws of the State of Alabama and the laws of The United States. The corporation was established on or about August 17, 2000 through an incorporation by individually named defendants Charles M. McInteer and Marilyn Elizabeth Lachman.  YHAP was created for the purpose of providing medical (e.g., psychiatric) services to patients of health care facilities (e.g., acute care hospitals,  psychiatric hospitals and skilled nursing facilities) located within the State of Alabama.

56.    RELATOR is informed and believes, and on that basis avers, that YHAP is, and at all times material hereto has been, designated (or it has and maintains professional employees or shareholders who are designated) by CMS as a qualified provider of health care (i.e., psychiatric) services and that it is (or its employees or shareholders are) therefore eligible for reimbursement for the provision of such services under the Medicare and Medicaid programs. He further avers that this defendant is (or its professional employees or shareholders are) a party to one or more Medicare Provider Agreements and, pursuant thereto and as a provider of health care services to SNF residents, such defendant (or its employees or shareholders) has/have agreed to observe, satisfy and comply with all federal laws, regulations, rules and instructions pertaining to the administration of the Medicare program in conjunction with participating SNF's including, but not limited to, those which are set out in the Code of Federal Regulations ("CFR") and other laws and regulations arising out of or pertaining thereto.

57.    RELATOR is informed and believes, and on that basis avers, that YHAP is, and at all times material has been, designated (or it has and maintains employees or shareholders designated) as a qualified provider(s) of health care (i.e., psychiatric) services under various Alabama Medicaid Agency ("Medicaid") programs which arise out of Title XIX of the Social Security Act. While Medicaid programs are administered by the various state governments, THE UNITED STATES OF AMERICA pays for a majority of all Medicaid costs. RELATOR is further informed and believes, and on that basis avers, that defendant YHAP is (or its professional employees or shareholders are) a party (or they are parties) to one or more Alabama Medicaid Agency Provider Agreement(s) and that such defendant (or its professional employees or shareholders) has/have agreed to observe, satisfy and comply with all federal and state laws, regulations, rules and instructions pertaining to the administration of the Alabama Medicaid Program including, but not limited to, those which are set out in the Code of Federal Regulations ("CFR") and other laws and regulations arising out of our pertaining thereto.

58.    *In the alternative*, RELATOR is informed and believes, and on that basis avers, that YHAP is, and at all times material hereto has been, a promotional, sales and/or "marketing" entity which has, and which has had, as its primary purpose the recruitment of Medicare and Medicaid insured patients (e.g., Alabama SNF residents) who are or were to be provided with health care services by defendants McINTEER and LACHMAN for a profit. Working in concert and collusion with such defendants, YHAP "submitted or caused to be submitted" false claims for Medicare and Medicaid reimbursement for which the parties claiming such reimbursement were not entitled to be paid.

59.     Defendants NORTHPORT HEALTH SERVICES, INC. ("NORTHPORT HEALTH"); NORTHPORT HEALTH AND REHABILITATION, L.L.C. ("NORTHPORT L.L.C."); BEVERLY HEALTH AND REHABILITATION SERVICES, INC. ("BEVERLY HEALTH"); BEVERLY ENTERPRISES-ALABAMA, INC. ("BEVERLY ENTERPRISES"); SUNBRIDGE HEALTHCARE CORPORATION ("SUNBRIDGE"); BEP SERVICES (SOUTHERN) LLC ("BEP SERVICES"); MARINER HEALTH CENTRAL, INC. ("MARINER"); RAINTREE HEALTHCARE CORPORATION ("RAINTREE"); NATIONAL HEALTHCARE CORPORATION ("NATIONAL HEALTHCARE"); HALEYVILLE HEALTH CARE CENTER, LLC ("HALEYVILLE HEALTH CARE"); EASTERN HEALTH SYSTEM, INC. ("EASTERN HEALTH") and CAPITOL HILL HEALTHCARE CENTER, INC. ("CAPITOL HILL") (which may be referred to individually herein as indicated above, or which may be referred to collectively as the "SNF CORPORATE PROVIDERS") are proprietary, for-profit, corporations organized and existing for the purpose of providing health care services, for a profit, to persons who are residents of skilled nursing facilities (e.g., "nursing homes"). Defendants McINTEER , LACHMAN and/or YHAP provide, and at all times material hereto have provided, or they claim to have provided, or they have facilitated provision of, health care (i.e., psychiatric) services to residents of certain skilled nursing facilities owned and/or operated by the SNF CORPORATE PROVIDERS.

For ease of reference by the District Court, RELATOR states that he is informed and believes, and on that basis avers, that the defendants denominated below in this subpart own and/or operate the Alabama SNF facilities which are shown, and that defendants McINTEER, LACHMAN and/or YHAP have submitted claims for reimbursement under the Medicare and Medicaid programs based upon their

representation that they have provided certain health care services to individuals residing in such facilities[38] and that the same are/were submitted as being, and were claimed to be, properly payable under such reimbursement programs, viz:

| CORPORATE DEFENDANT | FACILITY/FACILITIES | LOCATION(S) |
|---|---|---|
| NORTHPORT HEALTH SERVICES, INC.; NORTHPORT HEALTH AND REHABILITATION, LLC | ESTES GLEN HAVEN REHABILITATION AND NURSING CENTER | NORTHPORT |
| | ESTES HEALTH CENTER – PARK MANOR NURSING HOME | NORTHPORT |
| | ESTES NURSING FACILITY – OAK KNOLL NURSING HOME | BIRMINGHAM |
| BEVERLY HEALTH AND REHABILITATION SERVICES, INC.; BEVERLY ENTERPRISES-ALABAMA, INC. | BEVERLY HEALTHCARE – TRUSSVILLE | TRUSSVILLE |
| | BEVERLY HEALTHCARE – ONEONTA | ONEONTA |
| | BEVERLY HEALTHCARE - ARAB | ARAB |
| | BEVERLY HEALTHCARE – MEADOWOOD | BESSEMER |
| SUNBRIDGE HEALTHCARE CORPORATION | SUNBRIDGE CARE AND REHABILITATION CENTER – MUSCLE SHOALS | MUSCLE SHOALS |
| | SUNBRIDGE CARE AND REHABILITATION CENTER – SHOALS | TUSCUMBIA |
| | SUNBRIDGE CARE AND REHABILITATION CENTER – TUSCUMBIA | TUSCUMBIA |
| | SUNBRIDGE CARE AND REHABILITATION CENTER – GARDENDALE | GARDENDALE |

---

[38] The "owner" of an Alabama SNF, for reporting purposes through the Alabama Department of Public Health ("DPH") and the Alabama State Health Planning and Development Agency ("SHPDA"), may or may not be the same entity as the "operator" which is licensed by DPH and which is typically the subject of periodic inspections by the Joint Commission on Accreditation of Healthcare Organizations ("JCAHO"). The "SNF CORPORATE PROVIDERS" which are named as defendants are those entities which, according to the public record, are the owners of the relevant facilities which are, and which have been, Medicare and Medicaid "providers" of SNF services. ["Provider" is a generic term for any person (e.g., a physician) or entity (e.g., a home health agency, a hospital or a skilled nursing facility) approved to provide/give care to Medicare beneficiaries and to receive payment from Medicare (and Medicaid) in connection with the same. If it becomes evident, over the course of discovery, that there is a need to add to, or modify, the list of SNF "corporate providers," the plaintiffs will move to do so by way of amendment.]

| CORPORATE DEFENDANT | FACILITY/FACILITIES | LOCATION(S) |
|---|---|---|
| BEP SERVICES (SOUTHERN), LLC | TLC NURSING CENTER | ONEONTA |
| MARINER HEALTH CENTRAL, INC. | FAIRVIEW HEALTH AND REHABILITATION CENTER | BIRMINGHAM |
| RAINTREE HEALTHCARE CORPORATION | MARSHALL MANOR NURSING HOME | GUNTERSVILLE |
| NATIONAL HEALTHCARE CORPORATION | NHC HEALTHCARE CENTER – ANNISTON | ANNISTON |
| HALEYVILLE HEALTH CARE CENTER, LLC | HALEYVILLE HEALTH CARE CENTER | HALEYVILLE |
| EASTERN HEALTH SYSTEM, INC. | LAKEVIEW NURSING HOME | BIRMINGHAM |
| CAPITOL HILL HEALTHCARE CENTER, INC. | CAPITOL HILL HEALTH AND REHABILITATION CENTER | MONTGOMERY |

While the majority of these facilities are owned or operated by out-of-state, "foreign," corporations, all of the SNF facilities are located within the state of Alabama. Accordingly, each of the named corporate defendants has availed itself of the benefits and protections afforded by and under the substantive laws of the State of Alabama and has, by virtue of the ownership, location and/or operation of SNF facilities in this State, made itself amenable to process and suit in this jurisdiction.

60.     RELATOR is informed and believes, and on that basis avers, that each and every, all and several, of the SNF CORPORATE PROVIDERS are, and at all times material hereto have been, designated by CMS as a qualified providers of health care (i.e., skilled nursing facility) services and that such providers are, therefore, eligible for reimbursement for the provision of SNF services under the Medicare and Medicaid programs. He further avers that each and every, all and several, of the SNF CORPORATE PROVIDERS are parties to one or more Medicare Provider Agreements and, pursuant thereto and as authorized Medicare providers of health care services to SNF residents,

such defendants have agreed to observe, satisfy and comply with all federal laws, regulations, rules and instructions pertaining to the administration of the Medicare program in conjunction with the operation of SNF's including, but not limited to, those which are set out in the Code of Federal Regulations ("CFR") and other laws and regulations arising out of or pertaining thereto.

61.     RELATOR is informed and believes, and on that basis avers, that each and every, all and several, of the SNF CORPORATE PROVIDERS are, and at all times material hereto have been, designated as qualified providers of health care (i.e., skilled nursing facility) services under various Alabama Medicaid Agency ("Medicaid") programs which arise out of Title XIX of the Social Security Act. While Medicaid programs are administered by the various state governments, THE UNITED STATES OF AMERICA pays for a majority of all Medicaid costs. RELATOR is further informed and believes, and on that basis avers, that each and every, all and several, of the SNF CORPORATE PROVIDERS are parties to one or more Alabama Medicaid Agency Provider Agreement(s) and that such defendants have agreed to observe, satisfy and comply with all federal and state laws, regulations, rules and instructions pertaining to the administration of the Alabama Medicaid Program including, but not limited to, those which are set out in the Code of Federal Regulations ("CFR") and other laws and regulations arising out of our pertaining thereto.

62.     RELATOR is engaged in the private practice of medicine in the State of Alabama, where he specializes in adult psychiatry. In early March, 2003, RELATOR was engaged to, and he did, begin performing psychiatric consultations on certain individuals who were then (and most of whom continue today to be) residents of Park Manor Nursing Home, an SNF located in Tuscaloosa, Alabama and which is owned and/or

operated by defendants NORTHPORT HEALTH SERVICES, INC. and/or NORTHPORT HEALTH AND REHABILITATION, LLC. In the course of performing the initial consultations, RELATOR was told by a member of the SNF's general nursing staff that she was "glad [he was] coming [t]here" because of numerous "problems" which had been encountered with the psychiatrists "who ha[d] been seeing" the residents prior to, and including, the date of the initial consultations which were being performed by RELATOR. Those psychiatrists were identified to RELATOR as defendants McINTEER and LACHMAN.

63.    RELATOR was told, in early March, 2003 and by a member of the general nursing staff at Park Manor Nursing Home that, with regard to the prior and continuing provision of health care (psychiatric) services by defendants McINTEER and LACHMAN, the "last straw" (at least in the nurse's view) had occurred when it was learned that defendant LACHMAN had executed a medical "progress note" -- dated November 29, 2002 -- for "L.S.,"[39] a resident of the facility who had been assigned to defendant LACHMAN's care, and who had been deceased since October 4, 2002.

64.    RELATOR was gratuitously furnished a copy of the medical "progress note" for "L.S." dated November 29, 2002 and signed by "M. Elizabeth Lachman, M.D." Such note contains, among other things, the following entries regarding the "health conditions" observed in the SNF "resident" who was actually -- by the time of the entry by defendant LACHMAN -- _a decedent_, viz:

---

[39] In recognition of the recent issuance of certain "federal privacy standards" promulgated under the aegis of the "Health Insurance Portability and Accountability Act of 1996," Public Law 104-91 ("HIPAA"), which standards took effect on April 14, 2003, RELATOR refers herein to certain SNF residents by the use of initials, rather than any actual names, in order to protect the confidentiality of sensitive (and otherwise protected) patient medical information. At the appropriate time, and under specific disclosure conditions established by the Orders of this United States District Court, the UNTIED STATES and RELATOR will provide complete copies of relevant patient medical records and charts, redacted as directed by the Court.

(a)    PHYSICAL STATUS:

    (1)    SLEEP:                               Fair

    (2)    APPETITE:                           Poor

    (3)    ILL MEDICATION EFFECTS:    None

    (4)    PAIN COMPLAINTS:            None

(b)    MENTAL STATUS EXAMINATION:

    (1)    APPEARANCE:                   Clean

    (2)    DEMEANOR:                     Cooperative

    (3)    SPEECH:                           Slowed

    (4)    MOTOR:                            Slowed

    (5)    MOOD:                             Dysthymic

    (6)    AFFECT:                         Flat inappropriate; depressed

    (7)    THOUGHT PROCESS:          States needs

    (8)    COGNITIVE FUNCTION:       Decreased memory;
                                                  Decreased concentration;
                                                  Decreased attention;
                                                Judgment impaired;
                                                Confused; insight impaired

(c)    3 TARGET BEHAVIORS:       Doing better on current
                                                  medications

(d)    DIAGNOSIS/IMPRESSIONS:   Dementia / Depression

(e)    TREATMENT PLAN:          No change in current meds

                                                  Continue intensive supportive
                                                  psychotherapy for depression

(f)    FOLLOW-UP:                 1-3 months or earlier if indicated

Alarmed by the indisputable evidence that a _physician_ had executed a detailed medical "progress note" on a nursing home resident who had been _deceased_ for nearly two (2) months, and coupled with other information which was provided to him by members of the SNF general nursing staff, RELATOR became quite concerned about issues relating to possible Medicare and Medicaid fraud and abuse. Due to such

concerns, RELATOR began to make various inquiries of the SNF staff regarding the so-called "problems" which had been previously observed in relation to the provision of health care services to SNF residents by defendants McINTEER and LACHMAN.

65.    RELATOR is in possession of actual facts which inform him, and other information which causes him to believe and upon which basis he avers, that defendants McINTEER and LACHMAN, acting individually and in concert with each other and/or under the auspices of, or under the corporate entity known as, YHAP PSYCHIATRIC SERVICES, INC., acting separately and together with the various SNF CORPORATE PROVIDERS, have engaged in, and they continue to be engaged in, an ongoing and systematic scheme, artifice or device which has resulted in the illegal payment of federal Medicare and Medicaid reimbursements to such defendants.

As evidence of the operation of the defendants' unlawful reimbursement scheme, the existence of which RELATOR only discovered in early March, 2003 but which THE UNITED STATES OF AMERICA and RELATOR reasonably believe has been ongoing for as long as approximately three (3) years prior to March, 2003, plaintiffs respectfully show and represent unto this United States District Court as follows, viz:

(a)    Defendants McINTEER and LACHMAN, acting separately and severally, and/or under the auspices of defendant YHAP PSYCHIATRIC SERVICES, INC., are presently engaged in, and have at other times material hereto been engaged in, the submission of claims for reimbursement under the Medicare and Medicaid programs which are, or which have been, materially false and fraudulent and which are, or were, based upon health care services which were not, in fact, rendered to Alabama SNF patients but for which, nevertheless, the defendants sought (and in most instances obtained) monetary reimbursement;

(b)    Defendants McINTEER and LACHMAN, acting separately and severally, and/or under the auspices of defendant YHAP PSYCHIATRIC SERVICES, INC., are presently engaged in, and have at other times material hereto been engaged in, the

submission of claims for reimbursement under the Medicare and Medicaid programs which are, or which have been, materially false and fraudulent and which are, or were, based upon health care services <u>which were not reasonable or medically necessary under the program guidelines of the Medicare and Medicaid programs but for which, nevertheless, the defendants sought (and in most instances obtained) monetary reimbursement;</u>

(c)   Defendants McINTEER and LACHMAN, acting separately and severally, and/or under the auspices of defendant YHAP PSYCHIATRIC SERVICES, INC., and the SNF CORPORATE DEFENDANTS, separately and severally and/or in concert with Defendants McINTEER and LACHMAN, are presently engaged in, and have at other times material hereto been engaged in, the submission of claims for reimbursement under the Medicare and Medicaid programs which are, or which have been, materially false and fraudulent and which are, or were, <u>grounded upon the systematic "upcoding" of medical services for Alabama SNF patients and for which the defendants sought (and in most instances obtained) reimbursement at improper levels;</u>

(d)   Defendants McINTEER and LACHMAN, acting separately and severally, and/or under the auspices of defendant YHAP PSYCHIATRIC SERVICES, INC., and the SNF CORPORATE DEFENDANTS, separately and severally and/or in concert with Defendants McINTEER and LACHMAN, are presently engaged in, and have at other times material hereto been engaged in, the submission of claims for reimbursement under the Medicare and Medicaid programs which are or which have been materially false and fraudulent and which are, or were, <u>grounded upon the completion of "mental status examinations" by persons who are members of the SNF nursing staff  and which, accordingly, are unqualified to make such evaluations of the SNF patients but for which, nevertheless, defendants McINTEER and LACHMAN have sought (and in most instances obtained) reimbursement;</u>

(e)   Defendants McINTEER and LACHMAN, acting separately and severally, and/or under the auspices of defendant YHAP PSYCHIATRIC SERVICES, INC., and the SNF CORPORATE DEFENDANTS, separately and severally and/or in concert with Defendants McINTEER and LACHMAN, are presently engaged in, and have at other times material hereto been engaged in, the submission of claims for reimbursement under the Medicare and Medicaid programs which are or which have been materially false and fraudulent and which are, or were, <u>based upon the use of "pre-formed" or "cookie cutter" patient evaluations and the use of repetitive, and inappropriate, diagnostic codes with</u>

<u>treatment plans patently in conflict with diagnoses and mental conditions of the patients;</u>

(f)    Defendants McINTEER and LACHMAN, acting separately and severally, and/or under the auspices of defendant YHAP PSYCHIATRIC SERVICES, INC., and the SNF CORPORATE DEFENDANTS, separately and severally and/or in concert with Defendants McINTEER and LACHMAN, are presently engaged in, and have at other times material hereto been engaged in, the submission of claims for reimbursement under the Medicare and Medicaid programs which are or which have been materially false and fraudulent <u>and which are, or were, based upon patient "progress notes" which were completed by unauthorized SNF personnel or other persons not qualified to perform such functions; were based upon forged physician signatures; were the result of the use of prior "progress notes" which had patient information, or physician signatures, "whited out" or otherwise removed, altered or redacted and which obviously demonstrated a lack of proper and adequate patient care and treatment or, in some instances, no visit at all;</u>

(g)    Defendants have failed to provide SNF patients with the standard of care and treatment which is mandated under the applicable Medicare and Medicaid program guidelines, thus rendering the claims for reimbursement for such care and treatment actionable under the relevant provisions of the federal False Claims Act. By way of example, defendant LACHMAN diagnosed SNF resident "B.L." as suffering from dementia, with behavioral disturbances associated with depression, on 10/19/02; 11/29/02 and again on 3/9/03. <u>Yet on each progress note for such patient, defendant LACHMAN ordered "no change in current meds" and that the patient was to continue to receive "intense supportive psychotherapy for labile mood," a clinically inappropriate response in view of the patient's diagnosis and impaired cognitive function;</u>

(h)    Defendants have failed to provide SNF patients with the standard of care and treatment which is mandated under the applicable Medicare and Medicaid program guidelines, thus rendering the claims for reimbursement for such care and treatment actionable under the relevant provisions of the federal False Claims Act. By way of example, defendant McINTEER provided the nursing staff of one of the named defendant's SNF facilities with "blank" medical "progress notes" <u>and instructed the nurses to "fill out" the sections on physical and mental status for resident "L.D." on or about 9/21/02 and on other occasions. The "progress note"</u>

37

<u>reflecting the services for which reimbursement was being sought was signed, upon information and belief, by someone other than defendant McINTEER, which is a prohibited practice under the program guidelines of Medicare and Medicaid;</u>

(i)     Defendants have failed to provide SNF patients with the standard of care and treatment which is mandated under the applicable Medicare and Medicaid program guidelines, thus rendering the claims for reimbursement for such care and treatment actionable under the relevant provisions of the federal False Claims Act. By way of example, defendant LACHMAN, on or about the dates 3/9/03 and 4/15/03 found the same "behavioral disturbance with associated depression" to be present for SNF patient "A.H." yet she ordered no change in current medications and a continuation of her "intensive supportive psychotherapy for depression and labile mood." <u>Patient "A.H." is shown on the progress note to be deaf;</u>

(j)     A *cursory* review of the charts of SNF patients who have been treated over the past two years by the defendants, McINTEER and LACHMAN, <u>reveals a disturbing pattern of repetitive entries for numerous patients under "target behaviors", "diagnosis" and "treatment plan."</u> Numerous patient "progress notes," including those for residents "J.M.," "C.B.," "D.L.," and E.R.," for example, contain the same set of <u>obviously-perfunctory entries</u>, *viz:*

> (i) *"Doing well on current medications..."*
> (ii) *"Dementia with behavioral disturbances and associated depression..."*
> (iii) *"No change in current medications..."*
> (iv) *"Continue intensive supportive psychotherapy for depression and labile mood..." and*
> (v) *"Follow-up in 1-3 months or earlier if indicated..."*

**<u>RELATOR is engaged in the active practice of psychiatry and, based thereon, avers that significant numbers of SNF patients have very clearly been the subject of "cookie cutter" mental status evaluations and diagnoses and the so-called "treatment plans" for these residents has been ineffective and inappropriate to their documented physical and mental conditions;</u>**

(k)     Defendants McINTEER and LACHMAN, based upon actual information in the possession of RELATOR, have repeatedly

and over and extended period of time of *at least* the past three (3) years (and presumably longer) made findings of cognitive function impairment; insight impairment with diagnoses of dementia with behavioral disturbances and associated depression <u>and yet the "treatment plan" which defendants have ordered, and the services for which defendants have sought (and obtained) reimbursement have included the continuation of *"intensive supportive psychotherapy for labile moods and no change in current treatment."* This not only constitutes the provision of psychiatric care which falls below the acceptable standard of care for such patients but the filing of claims for the rendering of such services constitutes a violation of the federal False Claims Act</u>;

(l)     RELATOR has reason to believe, and based thereon he avers, that defendants McINTEER and LACHMAN engage in the unlawful practice, and have engaged in the unlawful practice, of submitting claims to Medicare and Medicaid for services not actually provided and/or for patient visits not actually made. As one example of this fact, RELATOR has recently treated SNF resident "J.B.," <u>who RELATOR immediately had to refer to a general surgeon for the amputation of the patient's foot *due to gangrene*</u>. The physical condition of the resident had obviously been deteriorating for a number of weeks and he had been previously seen, at least according to patient records, by defendants McINTEER and LACHMAN. <u>RELATOR avers that either the defendants did not, in fact, see the resident as they reported (and as they billed for) or, in the alternative, that the defendants did see the resident and yet the failed to take any medical action to address the gangrene of the patient's foot</u>.

RELATOR has now conferred with the general surgeon who performed the procedure and who indicates it was successful. Sadly, the resident who lost his foot is now coherent and in an improving physical and mental condition. <u>RELATOR concludes that the reason for the improvement in the patient is that "he is no longer infectious," a condition which would reasonably have been observed – and addressed – by defendants McINTEER and LACHMAN (and SNF general nursing staff) if, indeed, they had been properly caring for SNF resident "J.B."</u>;

(m)    RELATOR has also recently been called in, and has treated, SNF resident "H.M." who had been previously seen on a regular basis by defendants McINTEER and LACHMAN. RELATOR found, <u>*contrary to the medical records which had been maintained by the defendants*</u>, that "H.M." was *not* "doing well on current medications," as stated in the medical "progress note" dated 4/5/03 and

signed by defendant LACHMAN. <u>Rather, SNF resident "H.M."
was diagnosed by RELATOR to be psychotically depressed and
in immediate need of admission to an inpatient psychiatric
hospital facility, which he ordered ASAP and upon the first
bed availability. RELATOR refers to "H.M.," unfortunately, as
a victim of nursing home (and physician) neglect and abuse;</u>

(n)    RELATOR has been recently called in, and has treated, SNF
       resident "J.P." While under the care and treatment of defendant
       LACHMAN,  resident "J.P." was heavily medicated and found to
       be "doing well on current meds." No change was ordered, and
       the patient was to continue receiving "intensive supportive
       psychotherapy for coping skills." <u>RELATOR found this patient
       in immediate need of medication reduction, which he has now
       ordered and which is occurring. The resident's condition appears
       to be gradually improving as she comes out of the drug-induced
       "haze" in which she has been subsisting for the past year;</u>

(o)    SNF resident "J.R." has now come under the care of RELATOR,
       after being treated for months by defendant LACHMAN. In
       her medical "progress notes" dated 3/9/03 and 4/5/03, resident
       was diagnosed as "depressive" and there is no change indicated
       for his psychotropic medications. The treatment plan consists
       of the entry: "Continue intensive supportive psychotherapy
       for depression." <u>Yet RELATOR examined "J.R." and found him
       to be in immediate need of proper nutrition; indeed, "J.R." only
       weighed approximately 97 pounds. RELATOR has placed the
       resident on a high protein "milk shake" diet, for the present
       time, and will continue to observe the resident to determine
       if it may be medically necessary that he be admitted to a general,
       acute care, hospital for further treatment and observation;</u>

(p)    SNF resident "E.J." has been recently seen by RELATOR <u>and
       upon physical examination was found to have a testicular
       growth or mass *approximately the size of a softball*.</u> Even though
       SNF resident "E.J." had been seen on a regular and recurring
       basis by defendant LACHMAN, at least according to the SNF
       medical records, defendant LACHMAN found the resident to be
       "doing better on current meds" on 4/5/03. No change was made
       in his medication. "E.J.," – like so many of the numerous SNF
       residents under the defendants' care – <u>was to continue in the
       receipt of "intensive supportive psychotherapy for depression."
       RELATOR , upon his initial consult with the resident, made
       an immediate referral to an area surgeon who successfully
       removed the growth or mass. The resident is recuperating
       well at this time and continues to be seen by RELATOR;</u>

40

(q)     Based upon his examination and treatment of numerous of
        the SNF residents who have been previously treated by
        defendants McINTEER and LACHMAN, and combined with
        a review of the SNF medical records relating to such residents,
        RELATOR has concluded, and on such basis he avers, that the
        Defendants McINTEER and LACHMAN have engaged in the
        impermissible and inappropriate chemical restraint of Alabama
        SNF residents in violation of Medicare and Medicaid protocol,
        program guidelines and sound medical practice. Defendants'
        inappropriate imposition of "chemical restraint" upon the SNF
        residents results in the defendants' Medicare and Medicaid
        claims for reimbursement being fraudulent, giving rise to civil
        liability therefor under the federal False Claims Act;

(r)     RELATOR is reliably informed, and on such basis he avers,
        that defendants McINTEER and LACHMAN engage in the
        practice, and have for an indefinite period of time engaged
        in the practice, of making their calls or rounds at various of
        the defendants' SNF facilities on Saturdays; late at night and
        during early morning hours. Based upon information he has
        been provided, RELATOR has reasonably concluded, and on
        such basis he avers, that the defendants have engaged in this
        pattern and practice of making irregular, unannounced, odd or
        inappropriate visits to SNF locations – in many instances, over
        the objections of, or in the face of concerns expressed by, nursing
        staff – in order that there would be minimal observation of the
        medical services provided (or not) and the time spent with the
        SNF residents assigned to defendants' professional care. This
        conduct and behavior, RELATOR avers, is inconsistent with
        the proper and effective provision of psychiatric care to SNF
        residents; it produces little, if any, clinical benefit to the patient
        and it is strong circumstantial evidence of a continuing pattern
        of Medicare and Medicaid billing fraud and abuse on the part of
        defendant physicians and the  SNF CORPORATE PROVIDERS.

        Moreover, RELATOR draws the District Court's attention to the
        fact that, in contravention of Medicare and Medicaid protocols,
        defendants McINTEER and LACHMAN engage in the practice,
        as they have for at least the last two (2) years, of regularly and
        routinely omitting from medical "progress notes" and other SNF
        facility records the actual time of day, or period of duration, of
        their visits with, and care and treatment of, SNF patients. This
        is further evidence, RELATOR avers, of the defendants' scheme
        of submitting false and fraudulent claims for reimbursement to
        the Medicare and Medicaid programs; upon information and
        belief, a true and accurate record of time actually spent with the
        referenced SNF residents would reveal, and indeed underscore,

41

the fraudulent nature of the defendants' Medicare and Medicaid
submissions, many of which are clearly violative of the federal
False Claims Act and, therefore, actionable hereunder. ·

66.     RELATOR is reliably informed and he believes, and upon such basis he

avers, that defendants McINTEER, LACHMAN and/or YHAP, acting separately and

severally and in concert with the SNF CORPORATE PROVIDERS, are engaged in, and

have been engaged in during all times material hereto, an unlawful multi-county scheme

which involves and is grounded upon the repeated submission of false or fraudulent

claims for reimbursement for health care services ostensibly provided to Alabama SNF

residents under the Medicare and Medicaid programs. The physician defendants have

civil liability under the federal False Claims Act based upon, among other things, the

filing of claims for federal reimbursement in light of, and despite, the nature, type, scope,

quality and existence, *vel non*, of the health care (e.g., psychiatric) services which they

provide, have provided, claim to provide or claim to have provided, to Alabama SNF

residents who are eligible beneficiaries of the Medicare and Medicaid programs.

The SNF CORPORATE PROVIDERS have civil liability under the federal False

Claims Act based upon, among other things,  the filing of claims for federal

reimbursement, including but not limited to global *per diem* payments made to, or for the

benefit of, the various skilled nursing facilities owned and/or operated by such

defendants, in light of and despite various violations of the Nursing Home Reform Act,

and other applicable federal statutes and regulations, which mandate that such

defendants provide Medicare-eligible SNF residents with a reasonably safe environment

in which their physical and mental health needs are properly met. The SNF

CORPORATE PROVIDER defendants in this action have failed or refused, intentionally,

negligently or wantonly, to "care for [the facilities' SNF] residents in such a manner and

in such an environment as will promote maintenance or enhancement of the quality of life of each resident." 42 U.S.C. Secs. 1396r (b)(1)(a), 1395i-3 (b)(1)(a) (1994). They have, separately and severally, and acting in complicity or concert with defendants McINTEER, LACHMAN and/or YHAP, failed or refused, intentionally, negligently or wantonly, to provide "services and activities to attain or maintain the highest practicable physical, mental, and psychological well-being of each resident" in accordance with "individualized written care plans" which are reasonably designed to accomplish such objectives. *Id*, at Secs. 1396r (b)(2)(a), 1395i-3 (b)(2)(a) (1994).

67.     THE UNITED STATES OF AMERICA and RELATOR are reasonably informed, and based thereupon they allege, that the wrongful conduct complained of herein on the part of all of the named defendants is such as to actually endanger the health and safety of the SNF residents who are located in the facilities owned and/or operated by the SNF CORPORATE PROVIDER defendants. Accordingly, the plaintiffs respectfully suggest to the United States District Court that preliminary and permanent injunctive relief is needed and warranted upon a consideration of all the relevant circumstances, to the end that the defendant physicians, and the facility owners and operators, will be enjoined against and from further and future violations of the Nursing Home Reform Act and other governing federal law related to the lawful operation of skilled nursing facilities, and the provision of health care services in such facilities, in the State of Alabama.

## COUNT ONE

## SUBSTANTIVE VIOLATIONS OF THE
## FEDERAL FALSE CLAIMS ACT

68.     The plaintiffs adopt and incorporate herein by reference, as fully and as completely as if set forth here in their entirety, the allegations set forth in paragraphs "1" through "67," inclusive, of this complaint.

69.     This is a claim for treble damages and forfeitures under the federal False Claims Act, 31 U.S.C. Sections 3729-32, as amended.

70.     Through the acts described hereinabove, the defendants and their agents, servants or employees knowingly, or with negligent, reckless or wanton indifference, presented or caused or allowed to be presented to The United States government, and to the government of the State of Alabama through the Alabama Medicaid Agency, false and fraudulent claims, records and statements in order to obtain reimbursement for health care services allegedly provided under the Medicare and Medicaid programs.

71.     Through the acts described hereinabove and otherwise, defendants and their agents, servants or employees knowingly, or with negligent, reckless or wanton indifference, made, used or allowed, and/or caused to be made, used or allowed, false records and statements in order to get such false and fraudulent claims paid and approved by the government of THE UNITED STATES OF AMERICA and the government of the State of Alabama, acting through the Alabama Medicaid Agency.

72.     Through the acts described hereinabove and otherwise, defendants and their agents, servants or employees knowingly made, used and caused to be made or used false records and statements to conceal, avoid and/or decrease defendants' obligation to repay money to the government of THE UNITED STATES OF AMERICA and the

government of the State of Alabama, acting through the Alabama Medicaid Agency, that defendants improperly and/or fraudulently received. Defendants also failed to disclose to the federal and state governments material facts which would have resulted in substantial repayments by them, to the federal and state governments, upon disclosure.

73.     THE UNITED STATES OF AMERICA, its fiscal intermediaries and the Alabama Medicaid Agency, unaware of the falsity of the records, statements and claims made or submitted by the defendants and their agents, servants or employees, paid and continue to pay defendants for claims that should not have been paid, and which should not be paid in the future, if and when the truth had been known or is made known.

74.     THE UNITED STATES OF AMERICA, its fiscal intermediaries and the Alabama Medicaid Agency, unaware of the falsity of the records, statements and claims made or submitted by the defendants – or of their failure to disclose material facts which would have reduced government obligations for payment – have not recovered Medicare and Medicaid funds that would have been otherwise recovered and which are currently due.

75.     By reason of the defendants' false records, statements, claims and omissions, THE UNITED STATES OF AMERICA and the State of Alabama, acting through the Alabama Medicaid Agency, has been greatly damaged by virtue of the loss of substantial sums of money paid out under the Medicare and Medicaid programs which should not have been paid out in the past; which should not be paid out presently and which should not be paid out in the future.

76.     The wrongful conduct complained of herein on the part of the named defendants creates civil liability to THE UNITED STATES OF AMERICA under and by

virtue of the relevant provisions of 31 U.S.C., Section 3729 (a), and to the RELATOR under 31 U.S.C., Section 3730.

77.     In connection with the discovery and disclosure of the fraudulent activities and undertakings which have been related to THE UNITED STATES OF AMERICA and this United States District Court by RELATOR, acting as the "original source" for the reporting of such unlawful activity, and based upon his full and continuing cooperation with THE UNITED STATES OF AMERICA in its efforts to prevent fraud and recover monies unlawfully obtained by the defendants, RELATOR is entitled to statutory compensation from and under any award of damages, and otherwise as provided by applicable law.

78.     The RELATOR has retained undersigned counsel of record, and is obligated to pay them a reasonable fee for the services they have provided herein.

## COUNT TWO

## FALSE CLAIMS ACT CONSPIRACY

79.     The plaintiffs adopt and incorporate herein by reference, as fully and as completely as if set forth here in their entirety, the allegations set forth in paragraphs "1" through "78," inclusive, of this complaint.

80.     Through the acts described above and otherwise, defendants entered into a conspiracy or conspiracies among themselves and with others to defraud THE UNITED STATES OF AMERICA and the Alabama Medicaid Agency by causing false and fraudulent claims to be allowed and paid. Defendants have also conspired to omit disclosing, or they have actively moved to conceal, facts which (if known) would have

reduced government obligations to them or which would have resulted in repayments from them to government programs.

81.     Defendants have taken substantial steps in furtherance of the described conspiracies, *inter alia*, by preparing false cost reports and other records; by submitting such records to the government for approval and payment and by directing their agents, servants, consultants or employees not to disclose, and/or to conceal, defendants' fraudulent billing practices.

82.     THE UNITED STATES OF AMERICA, its fiscal intermediaries and the Alabama Medicaid Agency, unaware of defendants' conspiracies or the falsity of the records, statements and claims made by the defendants and their agents, servants, employees and co-conspirators, and as a result thereof, have paid and continue to pay substantial sums of money, wrongfully, in Medicare and Medicaid reimbursements which they should not, and would not, otherwise have paid. Furthermore, because of the false records, statements, claims and omissions by the defendants and their agents, servants, employees and co-conspirators, THE UNITED STATES OF AMERICA, its fiscal intermediaries and the Alabama Medicaid Agency, have not recovered Medicare and Medicaid funds from the defendants which otherwise would have been recovered (or which would never have been paid in the first instance had true facts been known).

83.     By reason of the defendants' conspiracies and the acts taken in furtherance thereof, THE UNITED STATES OF AMERICA and the Alabama Medicaid Agency have been greatly damaged by virtue of the loss of substantial sums of money paid out under the Medicare and Medicaid programs which should not have been paid out in the past; which should not be paid out presently and which should not be paid out in the future.

## COUNT THREE

## <u>FRAUD</u>

84.    The plaintiffs adopt and incorporate herein by reference, as fully and as completely as if set forth here in their entirety, the allegations set forth in paragraphs "1" through "83," inclusive, of this complaint.

85.    For a period of time commencing in approximately August of 2000, and continuing to the present, defendants McINTEER and LACHMAN, separately and severally and acting in concert and confederation with, or with the negligent, reckless or wanton approval of, the defendant SNF CORPORATE PROVIDERS, falsely misrepresented to THE UNITED STATES OF AMERICA, and the Alabama Medicaid Agency, the material fact that the claims they were submitting for reimbursement, in connection with the alleged provision of health care (i.e., psychiatric) services to Alabama SNF residents, were lawful, correct and properly payable under applicable law and Medicare and Medicaid regulations. Such representations were untrue and they were known by the defendants to be untrue at the time such statements were made.

86.    In similar fashion, and for a period of time commencing in approximately August of 2000 and continuing to the present, the defendant SNF CORPORATE PROVIDERS, separately and severally, falsely misrepresented to THE UNITED STATES OF AMERICA and the Alabama Medicaid Agency the material fact that the claims they were submitting for *per diem* and other reimbursement, growing out of or associated with the alleged provision of health care services to SNF residents, were lawful, correct and properly payable under applicable law and Medicare and Medicaid regulations. Such

representations were untrue and they were known by the defendants to be untrue at the time such statements were made.

87.     The misrepresentations made to THE UNITED STATES OF AMERICA and to the Alabama Medicaid Agency by the defendants, separately and severally, were made willfully to deceive or they were made recklessly without knowledge of the truth or falsity of the statements made. The statements, under the context and in the settings wherein they were made, constitute actionable fraud under established Alabama law.

88.     The misrepresentations complained of herein, under the relevant circumstances then in place, were reasonably relied upon by THE UNITED STATES OF AMERICA and the Alabama Medicaid Agency prior to, and in conjunction with, the payment of money to the defendants under the Medicare and Medicaid programs.

89.     THE UNITED STATES OF AMERICA, and the Alabama Medicaid Agency, have been greatly damaged by virtue of the loss of substantial sums of money paid out under the Medicare and Medicaid programs which should not have been paid out in the past; which should not be paid out presently and which should not be paid out in the future. The injury caused to the plaintiffs is a proximate consequence of the fraud and misrepresentation practiced upon THE UNITED STATES OF AMERICA and the Alabama Medicaid Agency by the defendants, separately and severally.

90.     The fraud perpetrated upon THE UNITED STATES OF AMERICA and the Alabama Medicaid Agency, by the defendants, was (and it has continued to be) unknown to the federal and state governments until it was discovered by RELATOR in the course of the discharge of his professional duties as a medical doctor treating certain Alabama SNF residents in early March, 2003 and continuing to the present time.

91.    The facts of this matter, over an extended period of time, demonstrate by clear and convincing evidence that the defendants have consciously or deliberately engaged in fraud or wantonness with regard to the claims they have wrongly submitted to THE UNITED STATES OF AMERICA and the Alabama Medicaid Agency. Accordingly, the conduct complained of herein justifies and supports an award of both compensatory and punitive damages under settled Alabama law.

## PRAYER FOR RELIEF

**WHEREFORE**, RELATOR does hereby claim damages for and on behalf of THE UNITED STATES OF AMERICA, and for himself in his individual capacity, and against the named defendants, against whom he seeks entry of judgment as follows, *viz:*

A.    For the disgorgement and return of all monies and things of value which have been falsely obtained by the named defendants and which are the rightful and lawful property of THE UNITED STATES OF AMERICA and to which the named defendants have no lawful claim of entitlement or possession;

B.    For the imposition of civil penalties and fines, for each and every false claim that defendants have presented to THE UNITED STATES OF AMERICA and/or its grantees or nominees, and the Alabama Medicaid Agency, pursuant to the provisions of 31 U.S.C., Section 3729 *et seq.*;

C.    For the award of compensatory and treble damages pursuant to the relevant provisions of 31 U.S.C., Section 3729 *et seq.*;

D.     For the issuance of temporary and permanent injunctive relief to stop the continuation, and prevent the recurrence, of the False Claims Act violations for which redress is sought under this complaint;

E.     For an award of compensatory and punitive damages based upon the pendent state law claims dealing with misrepresentation and fraud perpetrated by the defendants, as outlined hereinabove, and as set out under the substantive law of this jurisdiction;

F.     For the award of reasonable attorneys' fees;

G.     For an Order from this Court to the effect that RELATOR be awarded the maximum amount allowable under the relevant provisions of the False Claims Act for the services he has rendered herein, taking into special account RELATOR'S standing in the community as a member of the medical profession and RELATOR'S willingness, nevertheless, to bring the subject violations to the attention of THE UNITED STATES OF AMERICA and this United States District Court for the Northern District of Alabama;

H.     For the award of applicable pre- and post-judgment interest, as determined by the District Court;

I.     For the taxation of all costs of this action against the defendants, as calculated by the Clerk of the District Court or otherwise, and

J.     For the award of any and all such other, further or additional relief, general or special, legal or equitable, which this United States District Court may find to be proper, reasonable and appropriate following the full consideration and review of the relevant circumstances presented herein.

## DEMAND FOR JURY TRIAL

Pursuant to the relevant provisions of Rule 38 (b) of the *Federal Rules of Civil Procedure*, the plaintiffs hereby request trial by struck jury on all issues triable of right by a jury.

DATED: Tuscaloosa, Alabama this the __25th__ day of June, 2003.

Respectfully submitted,

**LEWIS & MITCHELL, LLC**
611 Helen Keller Boulevard
Post Office Box 020111
Tuscaloosa, Alabama 35404
(205) 633-0003

By: _____
Albert G. Lewis, LEW010

By: _____
W. Eason Mitchell, MIT020

By: _____
Justice D. Smyth, III, SMY004

*Attorneys for UNITED STATES and PATRICK BRUCE ATKINS, M.D., Plaintiffs*